# Exhibit "D"

## ASSET SALE AGREEMENT

THIS ASSET SALE AGREEMENT ("Agreement") is made this 16th day of November 2010, by and between Sovereign Bank (the "Seller"), with an office at 75 State Street, Boston, Massachusetts 02109, and the undersigned buyer (the "Buyer"), and sets forth the terms and conditions whereby the Seller agrees to sell and the Buyer agrees to purchase the Asset(s) identified herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and the Buyer hereby agree as follows:

**1.** **Definitions**. Capitalized terms shall be defined as set forth in this Agreement, including in Appendix A to this Agreement.

**2.** **Agreement to Purchase and Sell**. Subject to and in accordance with the terms and conditions of this Agreement, the Seller hereby agrees to sell, assign, transfer and convey to the Buyer on the Closing Date, and the Buyer hereby agrees to purchase and accept on the Closing Date, all rights, title, and interests of the Seller as of the Closing Date, in, to and under the Asset(s), set forth on Schedule A attached hereto. Seller has provided a completed Schedule A to Buyer setting forth all Asset(s) it will convey, and Buyer acknowledges it has reviewed Schedule A to its full satisfaction.

**3.** **Closing**. The closing shall occur on the Closing Date, by delivery of Closing Documents by hand or overnight delivery. In the event a copy of the Seller's signature to this Agreement is not delivered to the Buyer within one Business Day after the date hereof, the Buyer may extend the Closing Date by one Business Day for each Business Day of such delay.

**3.1** **Payment of Deposit and Purchase Price; Adjustments**. Buyer shall pay Seller, by wire transfer of immediately available funds, the Deposit no later than 5:00 p.m. on the Business Day following Seller's notice to Buyer of its selection as the winning bidder. On the Closing Date, the Buyer shall pay Seller, by wire transfer of immediately available funds, the amount of the Purchase Price, with any applicable adjustment as follows: (i) less the Deposit previously received by Seller, (ii) less all principal payments received by the Seller on account of the Asset(s) from the Calculation Date through the day before the Closing Date multiplied by the Bid Percentage, (iii) less any escrows held by, or plus any escrows owed to, Seller relating to the Asset(s), (iv) plus any protective advances made by Seller, in its reasonable discretion, between the Calculation Date and the Closing Date. The Purchase Price (as the same may be adjusted pursuant to the provisions of this Section 3.1) shall be calculated on a settlement statement prepared by the Seller and available for the Buyer's review one Business Day prior to the Closing Date.

**3.2** **Conveyance**. Upon receipt of the Purchase Price, the Seller shall sell, assign, transfer and convey the Asset(s) to the Buyer subject to and in accordance with the provisions of this Agreement, and as evidenced by a Bill of Sale and Assignment in the form attached hereto as Attachment 1.

1

**3.3** **Taxes, Fees, Etc.** The Buyer shall pay all transfer, filing and recording fees, taxes, costs and expenses, and any applicable documentary taxes, required to be paid by either the Seller or the Buyer in connection with the transaction contemplated hereby, and agrees to indemnify and hold the Seller harmless from and against any and all claims, liability, costs and expenses arising out of or in connection with the failure of the Buyer to pay any such amounts on a timely basis. The Seller shall be entitled to require the payment of any such fees, taxes, costs and expenses at or prior to the closing and as a condition thereof.

**3.4** **Payments by Obligors.**

With respect to any payments received made by an Obligor on account of any Asset, the following provisions shall apply:

(a) All payments of any kind and nature received by Seller on or prior to the Calculation Date shall be retained by Seller;

(b) All principal payments received by Seller after the Calculation Date (multiplied by the Bid Percentage) shall be credited against the Purchase Price for the benefit of Buyer, as set forth in Section 3.1 herein;

(c) All interest payments received by Seller after the Calculation Date but prior to the Closing Date shall be retained by Seller to the extent that interest has accrued and is unpaid for any period prior to and including the Calculation Date; and

(d) Except as otherwise provided herein, all payments of any kind and nature received on or after the Closing Date shall be for the benefit of Buyer and, if received by Seller, shall be paid to Buyer within a reasonable time after receipt with negotiable instruments being endorsed by Seller without recourse and without warranties.

**3.5** **Liquidated Damages.** In the event that Buyer fails to consummate the purchase of the Asset(s) hereunder, or to pay the Purchase Price as provided herein, Seller shall have the right to retain the Deposit or any other sums paid as liquidated damages. This provision shall not be deemed to limit Seller's right to seek additional remedies at law or in equity, including without limitation for specific performance, for any breach of other terms, covenants, conditions, representations or warranties contained herein.

**4.** **Transfer of Asset(s).**

**4.1** **Closing Documents.** Not later than the Business Day prior to the Closing Date, Seller shall deliver to Escrow Agent (i) a Bill of Sale and Assignment in the form attached hereto as <u>Attachment 1</u>, selling, assigning, transferring and conveying to the Buyer all rights, title and interests of the Seller in, to and under the Asset(s), on the terms and conditions set forth in this Agreement; and (ii) any original Note(s) in Seller's possession, or Affidavits of Lost Note(s) (collectively, to the extent delivered to Escrow Agent, the "Closing Documents"). The Bill of

Sale and Assignment included in the Closing Documents shall be without recourse, representation or warranty of any kind or nature. Such qualifying language on the Bill of Sale and Assignment shall not affect, limit or enlarge the obligations of the Seller or the rights, remedies and recourse of the Buyer under this Agreement. The assignment contemplated under the Agreement does not constitute an endorsement of any Asset and the Buyer agrees that it has no right to the unqualified endorsement of the Seller, notwithstanding the provisions of Massachusetts General Laws, Chapter 106, Section 3-203( c ). The Bill of Sale and Assignment shall have the same effect as an individual and separate bill of sale and assignment of each and every Asset referenced therein. Seller reserves the right to retain copies of all or any portion of the Asset Documents.

**4.2     Escrow Agent's Delivery of Closing Documents.** The Escrow Agent shall have no obligation to review the Closing Documents for completeness, authenticity, sufficiency, or otherwise. The Escrow Agent shall make the Closing Documents available for review by the Buyer prior to the closing. The Escrow Agent shall have the Closing Documents delivered to Buyer by hand or overnight delivery upon Seller's notification to Escrow Agent that Seller has received the Purchase Price. All expenses of transportation of the Closing Documents, the Asset Documents and of any other documents, instruments and files to be delivered to Buyer pursuant to this Agreement shall be borne by Buyer. In the event of a dispute or disagreement concerning delivery of the Closing Documents or Escrow Agent's duties hereunder, Escrow Agent shall take action at the written direction of both the Buyer and Seller or upon an order of a court of competent jurisdiction.

**4.3     Delivery of Collateral Documents, Etc.** Promptly after the closing, the Seller shall deliver to the Buyer all Asset Documents not already delivered including, without limitation, originals of each Collateral Document to the extent originals are in the Seller's possession.

**4.4     Execution of Separate Asset Assignments.** If requested by Buyer within six (6) months of the Closing Date, and to the extent prepared by Buyer in form reasonably satisfactory to Seller, Seller shall execute, and acknowledge if appropriate, and deliver to the Buyer such other additional documents as may be required by applicable public recording or filing laws to transfer to Buyer the rights, title and interests of the Seller in, to and under the purchased Asset(s) (collectively, "Separate Asset Assignments"). The Separate Asset Assignments shall be without recourse, representation or warranty of any kind or nature. Such qualifying language on the Separate Asset Assignments shall not affect, limit or enlarge the obligations of the Seller or the rights, remedies and recourse of the Buyer under this Agreement. The Buyer shall bear all costs and expenses of preparing, filing and recording each Separate Asset Assignment, and shall be solely responsible for the content and form of such documents, and for filing and recording same. Seller shall have no obligation whatsoever to execute or deliver Separate Asset Assignments or other additional documents later than six (6) months of the Closing Date.

**4.5     Hazard, Liability Insurance, Etc.** At the request and sole cost and expense of the Buyer, the Seller shall cooperate with the Buyer in executing written requests to each hazard, casualty and liability insurer, and to the writing agent for each flood hazard insurer, issuing a policy of insurance obtained by an Obligor with respect to the Asset(s), requesting an

endorsement of its policy of insurance effective on the Closing Date adding the Buyer as the mortgagee, the loss payee and/or an insured named therein, as the case may be, together with instructions that such endorsement be forwarded directly to the Buyer, with a copy to the Seller at the address specified herein for notices. Each such request shall be prepared by the Buyer at its sole cost and expense, and any additional premium or other charge in connection therewith shall be paid by the Buyer. The Buyer shall not be entitled to be added to or acquire an interest in any policy of insurance obtained by the Seller. Any loss on or after the Closing Date to an Obligor, to the Buyer or to the value or collectability of the Asset(s) due to the Seller's cancellation of collateral or real property risk insurance or its failure to identify Buyer as loss payee, mortgagee or other insured, is the sole responsibility of the Buyer.

**4.6** **Collection/Contingent Fees.** To the extent that any Asset transferred and sold hereunder is subject to any pending collection and/or contingent fee agreement by which any entity or person is entitled to payment based on the amounts collected, then the transfer of such Asset shall be made subject to the rights of any such entity or person and Buyer agrees to assume, and shall be deemed to have assumed, the collection and/or contingent fee agreement and shall be bound by the terms thereof to the same extent as if Buyer had independently contracted for such services.

**5.** **Representations and Warranties of the Buyer.** The Buyer hereby represents and warrants as follows:

**5.1** **Organization, Existence, Etc.** The Buyer is duly formed or organized, validly existing and in good standing under the laws of the jurisdiction of its formation or organization, and is registered or qualified to conduct business in all other jurisdictions in which the failure to be so registered or qualified would materially and adversely affect the ability of Buyer to perform its obligations hereunder.

**5.2** **Authority and Enforceability, Etc.** The Buyer has the power and authority to execute, deliver and perform each of the Sale Documents to which it is a party and has taken all necessary action to authorize such execution, delivery and performance. The Buyer's execution of this Agreement and its performance of its obligations hereunder are not subject to any further approval, vote or contingency from any person or committee, and does not constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, and will not result in the breach of, any contract, agreement or other instrument to which Buyer is party or which may be applicable to the Buyer or any of its assets, or result in the creation of a lien on any of its assets. Assuming due authorization, execution and delivery by the Seller, the Sale Documents and all obligations of the Buyer thereunder are the legal, valid and binding obligations of the Buyer, enforceable in accordance with the terms of the Sale Documents, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**5.3** **Conflict with Existing Laws or Contracts.** The execution and delivery of the Sale Documents and the performance by the Buyer of its obligations thereunder will not conflict with or be a breach of any provision of any law, regulation, judgment, order, decree, writ,

4

injunction, contract, agreement or instrument to which the Buyer is subject; and the Buyer has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by the Buyer of the Sale Documents.

**5.4  Financial Condition.** Neither the Buyer, nor any of its general partners, limited partners, shareholders or joint venturers is involved in any financial difficulties which would impair or prevent a closing pursuant to this Agreement. The Buyer has now and will have as of the Closing Date sufficient liquid assets, capital and net worth to meet its obligations under the Sale Documents and to pay the Purchase Price without any financing or other contingencies.

**5.5  Decision to Purchase/No Reliance.** The Buyer's bid and decision to purchase the Asset(s) is based upon its own comprehensive review and independent expert evaluation and analysis of the Asset Documents and other materials deemed relevant by the Buyer and its agents. In entering into this Agreement and the other Sale Documents, the Buyer has made such independent investigation as the Buyer deems to be warranted into the nature, title, attachment, perfection, priority, validity, enforceability, collectability, and value of the Asset(s) or the Note(s), the title, condition and value of any collateral securing the Asset(s), the market conditions and other characteristics of the places where any such collateral is located, and all other facts it deems material to the purchase of the Asset(s). Buyer enters into this Agreement solely on the basis of that investigation and Buyer's own judgment. Buyer has not relied upon any oral or written information from the Seller or any of its employees, agents, attorneys or representatives, other than the limited representations and warranties of the Seller contained herein. Buyer acknowledges that no employee, agent, attorney or representative of Seller was, is or has been authorized to make, and Buyer has not relied upon, any statements other than those specifically contained in this Agreement. Buyer acknowledges that some Asset(s) may be subject to actual or potential claims or disputes of Obligors against Seller. Buyer purchases those Asset(s) expressly subject to any rights of Obligors, and will not assert those claims, disputes or rights against Seller.

**5.6  Buyer an Accredited Investor.** The Buyer is an accredited investor (as that term is used in regulations promulgated under the Securities Act of 1933). Buyer is able to hold the Assets for an indefinite period of time, and is able to withstand the loss of the entire Purchase Price.

**5.7  Information True and Correct/Full Disclosure.** The information provided by the Buyer in connection with its qualification as a bidder was true and correct on the date provided and did not omit any information necessary to the accuracy and full disclosure of the information provided, and such information is accurate and complete on the date hereof except as the Buyer has otherwise disclosed in writing to the Seller upon or prior to submitting its bid.

**5.8  Confidentiality Agreement.** The Buyer has signed a confidentiality Agreement, the terms of which are incorporated herein. Buyer represents that it has not violated any terms of the Confidentiality Agreement. At no time has Buyer or any of its employees, agents, attorneys or representatives communicated with any Obligor or any of its representatives or agents regarding the Asset(s). Buyer has no affiliation with, any ownership interest in, or agreement with any Obligor or any of representatives or agents thereof regarding the Asset(s).

**5.9** **Brokers.** No broker or other party entitled to a commission is involved in this transaction, except for DebtX.

**5.10** **Survival.** The representations and warranties set forth in this Section 5 shall survive the Closing Date.

**6.** **Seller's Representations, Warranties and Recourse.** This sale is made without recourse against the Seller, or representation or warranty by the Seller, whether expressed, implied or imposed by law or equity, of any kind or nature except as provided in Section 6 of this Agreement. Without limiting the generality of the foregoing, and while Seller has attempted to provide accurate information to all prospective Bidders, the Seller does not represent, warrant or insure the accuracy or completeness of any information or its sources of information contained in the Bid Package or in the Asset Documents, Collateral Documents or Note(s) (whether contained in originals, duplicate originals, copies, or magnetic media, including computer tapes and discs of any of the foregoing), including without limitation any reports or other information prepared by accountants, engineers, appraisers, environmental consultants or other professionals. The Seller has not, does not and will not make any representations or warranties with respect to the collectability of any Asset or the value or condition of any Mortgaged Property.

Also without limiting the generality of the foregoing exclusion of representations and warranties, the sale and assignment contemplated hereunder is made without any of the representations and warranties set forth in Massachusetts General Laws, Chapter 106, Section 3-416 (a) as to the entitlement of the Seller to enforce any payment obligation or debt under or in connection with the Asset(s), the authenticity of any signatures on any Asset Documents, the authority of any individual to execute any Asset Documents, the lack of alteration of any Asset Documents, or that there are no offsets, deductions or counterclaims against the Asset(s) or any other claims or rights of any nature to which the Seller would be subject.

**6.1** **Representations and Warranties as to the Seller.** The Seller hereby represents and warrants as follows:

**6.1.1** **Organization, Existence, Etc.** The Seller is duly formed or organized, validly existing and in good standing under the laws of the jurisdiction of its formation or organization, and is registered or qualified to conduct business in all other jurisdictions in which the failure to be so registered or qualified would materially and adversely affect the ability of Seller to perform its obligations hereunder.

**6.1.2** **Authority, Enforceability, Etc.** The Seller has taken all necessary action to authorize execution, delivery and performance of each of the Sale Documents to which it is a party. Assuming due authorization, execution and delivery by the Buyer, the Sale Documents and all the obligations of the Seller thereunder are the legal, valid and binding obligations of the Seller enforceable in accordance with the terms of the Sale Documents, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**6.1.3   Conflict with Existing Laws or Contracts.** The execution and delivery of the Sale Documents and the performance by the Seller of its obligations thereunder will not conflict with or be a breach of any material provision of any law, regulation, judgment, order, decree, writ, injunction, contract, agreement or instrument to which the Seller is subject; and the Seller has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by the Seller of the Sale Documents.

**6.1.4   Legal Action Against Seller.** Seller has not received actual notice of any action, suit or proceeding pending against Seller in any court or by or before any other governmental agency or instrumentality which would materially affect the ability of Seller to carry out the transactions contemplated by the Sale Documents.

**6.1.5   Brokers.** No broker or other party entitled to a commission is involved in this transaction, except for DebtX.

**6.2   Representations and Warranties as to the Asset(s).** Except as otherwise disclosed in the Asset Documents, Seller hereby represents and warrants that, as to the Asset(s), the following representations and warranties are true and correct in all material respect as of the date hereof.

**6.2.1   Title to Asset(s).** The Seller has good title to and is the sole owner of the Asset(s), free and clear of any liens, claims, encumbrances or other charges whatsoever. Seller's interest in the Asset(s) is not subject to any prior assignment, conveyance, transfer or participation or agreement to assign, convey, transfer or participate, in whole or in part.

**6.2.2   Certain Schedule Information.** The principal balances due as of the Calculation Date for the Asset(s) set forth in Schedule A are not less than the amounts stated therein.

**6.2.3   Enforceability.** With regards to any individual Asset, on or prior to the Calculation Date, to the best of Seller's knowledge, a court of competent jurisdiction has not issued a final ruling (not subject to appeal or an extension of the time to take an appeal) adjudging that the Asset at issue is unenforceable under applicable state or federal law or unenforceable due to a finding that the signatures of all of the Obligors (and all other guarantors and/or sureties of the Asset, if any) were forged.

**6.2.4   No Release.** With regards to any individual Asset, on or prior to the Calculation Date, Seller has not executed or delivered a written release of all of the Obligor(s) from all indebtedness and obligations evidenced by the Note.

**7.   Conditions Precedent to Closing.** The respective obligations of the Buyer and the Seller to complete the purchase and sale of the Asset(s) pursuant to this Agreement are subject to the fulfillment on or prior to Closing Date of each of the following additional conditions to be

fulfilled by the other, unless the same is specifically waived in writing by the party for whose benefit the same is to be fulfilled:

**7.1    Performance of Covenants.** The Seller and the Buyer shall have performed all of their respective covenants and agreements contained herein which are required to be performed by them on or prior to the Closing Date.

**7.2    Representations and Warranties.** All representations and warranties of the Buyer and Seller set forth in this Agreement shall be true in all material respects at and as of the Closing Date.

**7.3    Governmental Approvals.** All requisite federal, state and local governmental and regulatory approvals relating to the transactions contemplated hereby, if any, shall have been obtained.

**7.4    Other Approvals.** Upon the request of the other, the Seller and the Buyer shall provide certified copies of appropriate resolutions, directions and consents approving the execution and delivery of the Sale Documents and the consummation of the transactions contemplated thereby, together with such other certificates of incumbency and other evidences of authority as the Seller or the Buyer or their respective counsel may reasonably require.

## 8.    Certain Obligations of the Buyer.

**8.1    Collection Practices.** Buyer will not violate any laws relating to unfair credit collection practices in connection with the Asset(s). The Buyer hereby agrees to indemnify the Seller and to hold it harmless from and against any and all claims, demands, losses, damages, penalties, fines, forfeitures, judgments, legal fees and any other costs, fees, and expenses incurred by the Seller as a result of (1) a breach by the Buyer of the aforesaid warranty or (2) any claim, demand, or assertion that, after the Closing Date, the Seller was in any way involved in or had in any way authorized any unlawful collection practices in connection with the Asset(s) transferred to the Buyer pursuant to this Agreement. The Buyer agrees to notify the Seller within ten (10) Business Days of notice or knowledge of any such claim or demand.

**8.2    Enforcement/Legal Actions.** Buyer will not institute any enforcement or legal action or proceeding in the name of Seller, or any subsidiary or affiliate thereof, or use the name of Seller, or any subsidiary or affiliate thereof, or make reference thereto, in any communication with any Obligor or with the general public regarding enforcement or collection of any Asset except to disclose that the Asset originated with Seller. In all legal actions and proceedings concerning any Asset which are pending as of the Closing Date, in which Seller is a party, Buyer will cause itself to be substituted as a party in place of Seller promptly after the Closing Date and commencing as of the Closing Date, neither the Seller nor its counsel shall have any responsibility with respect to such legal actions or proceedings of any nature or description, including, without limitation, to file or serve pleadings, responsive pleadings or documents, to respond to or file notices, to appear for hearings, conferences or depositions, or to otherwise act to preserve, enforce or protect any rights pertaining to the Asset(s). The Buyer hereby irrevocably appoints the Seller and Seller's agents as the true and lawful attorney of the Buyer

(which appointment is coupled with an interest) in the name, place and stead of, and at the expense of, the Buyer to take such actions and file such motions and other documents with the court and otherwise as necessary to substitute the Buyer in place of Seller in any such legal actions, to effectuate Seller's counsel's withdrawal as counsel from such legal actions, and to otherwise effectuate the Buyer's assumed obligations with respect to such legal actions. Seller may, but shall not be obligated to, utilize this power of attorney. The Buyer shall make its best efforts to forward to the Seller copies of any communications that it may receive in any such legal actions or proceedings during the time period commencing as of the Closing Date and ending on the date that the Buyer is substituted for the Seller is such legal action or proceeding. Buyer will not misrepresent, mislead, deceive or otherwise fail to disclose adequately to any Obligor or guarantor its identity as the owner of the Asset(s). Buyer will not take any enforcement action against any Obligor which would be unlawful or commercially unreasonable. In the event Buyer files a legal action to collect on an Asset and requests or subpoenas an officer, employee or agent of Seller to appear at a trial, hearing or deposition to testify about the Asset, Buyer will pay for the witness's time spent traveling, attending and testifying, whether or not the witness actually gives testimony, at Seller's standard daily rate, and Buyer will reimburse Seller for all out-of-pocket travel related expenses incurred by the witness.

**8.3    Release of Seller.**  Buyer will not renew, extend, renegotiate, compromise, settle or release any Asset, or any right of Buyer founded upon or growing out of this Agreement, except upon payment in full thereof, unless all Obligors on said Asset shall first release and discharge Seller, its parent, subsidiaries and affiliates, from all claims, demands and causes of action or omissions occurring prior to the date of such release.

**8.4    Indemnification.**  From and after the date of this Agreement, Buyer shall indemnify and hold harmless Seller, its parent, subsidiaries, affiliates, successors and assigns, and all directors, officers, employees and agents thereof from and against all liability for, and from and against any and all losses or damages Seller may suffer as a result of any claim, demand, cost, expense or judgment of any type, kind, character or nature (including any claim for attorneys' fees) which Seller shall incur or suffer as a result of (i) any act or omission of Buyer or Buyer's agents in connection with the Asset(s) and its purchase or collection of the Asset(s) pursuant to this Agreement; (ii) the material inaccuracy of any representation or warranty of Buyer; or (iii) the breach of any covenant of Buyer contained herein or in any Sale Document.

**8.5    Reporting to or for the Internal Revenue Service.**  Buyer agrees to submit all Internal Revenue Service Forms and Information Returns for the Asset(s) for the full year in which the closing occurs and thereafter.

**9.    Notice to Obligor.**  The Buyer shall, within five (5) Business Days after the Closing Date, give notice of the transfer of the Asset(s) to the Obligor, with a copy of the notice to the Seller, by first class U.S. Mail.

**10.    Notice of Claim.**  The Buyer shall immediately notify the Seller of any claim, threatened claim, or any litigation against the Seller, or any predecessors or affiliates which may come to its attention relating to the Asset(s).

9

**11.     Notices.** All notices or deliveries required or permitted hereunder shall be in writing and shall be deemed given when personally delivered to the individual hereinafter designated or when actually received by means of facsimile transmission, overnight mail, or registered or certified mail, return receipt requested in each case to the Seller at the following address, to the Buyer at the address set forth on the signature page below, or such other address as either party may hereafter designate by notice given in compliance with this Section to the other party:

SELLER:     Sovereign Bank
            Mail Code NY1-MLV-01-01
            3 Huntington Quadrangle
            Suite 101N
            Melville, NY 11747

            Attention: Karen Tennant
            Telephone Number:   (631) 531-0683
            Facsimile Number:   (631) 531-0684

With a      Sovereign Bank
copy to:    Mail Code: NJ1-6514-WO3
            830 Morris Turnpike
            Short Hills, NJ 07078

            Attention: Alan D Wiener
            Telephone Number:   (973) 232-8412
            Fax Number:         (973) 467-1626

And in each case with a copy to:

            The Debt Exchange, Inc.
            133 Federal Street, 10th Floor
            Boston, Massachusetts 02110

            Attention: Kevin J. Kelley, Esq.
            Telephone Number:   (617) 531-3433
            Facsimile Number:   (617) 531-3499

Any notice sent by fax must be confirmed by delivery of an original or hard copy on the next Business Day following transmission.

**12.     Severability.** Each part of this Agreement is intended to be severable. If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts

10

of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

**13.   Construction.** Unless the context otherwise requires, singular nouns and pronouns (including defined terms), when used herein, shall be deemed to include the plural and vice versa, and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

**14.   Assignment.** This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof, including any attachments hereto, shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors, and assigns. Notwithstanding anything herein to the contrary, however, Buyer shall not assign its rights under this Agreement without the prior written consent of the Seller, and in any event no such assignment shall relieve Buyer of any liability hereunder.

**15.   Prior Understandings.** This Agreement supersedes any and all prior discussions and agreements between the Seller and the Buyer with respect to the purchase of the Asset(s) and other matters contained herein, and this Agreement contains the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein.

**16.   Survival.** Each and every covenant made by the Buyer or the Seller in this Agreement shall survive the closing and shall not merge into the closing documents, but instead shall be independently enforceable, provided, however, that the Seller's representations and warranties set forth in Section 6.2 shall expire ninety (90) days after the Closing Date, after which time no claim for breach of Seller's representations or warranties may be made.

**17.   Choice of Law/Forum Selection.** This Agreement and claims arising out of or in connection therewith shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts, and the Buyer consents to jurisdiction in the federal or state courts situated in Boston or Suffolk County, Massachusetts.

**18.   WAIVER OF JURY TRIAL. The Buyer waives any present or future right to a trial by jury in any case or controversy in which the Seller is or becomes a party (whether such case or controversy is initiated against the Seller or in which the Seller is joined as a party litigant), which case or controversy arises out of, or is in respect to this Agreement.**

**29.   Limitation of Damages.** (a) If after the Closing Date there is a breach by Seller of any representation or warranty set forth in Section 6.2 which has not expired at the time of breach, the Buyer shall give written notice to the Seller within thirty (30) days of discovery of such breach, but in no event later than ninety (90) days after the Closing Date, and the Seller shall have the right to cure such breach during a period of ninety (90) days after receipt of such notice. If such breach or failure is not duly cured within such ninety (90) day period, or not waived or consented to in writing by the Buyer, the Seller may elect, in its sole discretion to either (i) repurchase the Asset(s) affected by the breach at the Repurchase Price, or (ii) to pay to Buyer the

11

Buyer's actual damages directly caused by such breach, up to an amount not exceeding the Repurchase Price.

(b) In no event shall either party be liable to the other for any consequential, incidental, special or punitive damages.

(c) The Buyer's remedies set forth in this Section shall be the exclusive remedies of the Buyer for Seller's breach of any warranty, and the Buyer shall not be entitled to any other rights, remedies or other relief, at law or in equity, for Seller's breach of any representation or warranty set forth in this Agreement.

**20.** **Casualty**. Should any real property securing an Asset be partially or totally damaged by fire or other casualty prior to Closing Date, Seller shall have the right, at its sole option, to terminate this Agreement with respect to such Asset, by written notice to Buyer, and appropriate adjustment shall be made to the Purchase Price.

**21.** **Time of the Essence**. Time is of the essence of all provisions of this Agreement.

**22.** **No Third Party Beneficiaries**. This Agreement is for the sole and exclusive benefit of the parties hereto, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other party or entity.

WITHOUT LIMITATION, EXCEPT AS EXPRESSLY SET FORTH IN SECTION 6 OF THIS AGREEMENT, SELLER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF TRANSFER, QUALITY, FITNESS, MERCHANTABILITY OR OTHERWISE, RELATING TO ANY OF THE COLLATERAL DOCUMENTS, CLAIMS AND OBLIGATIONS TO BE CONVEYED HEREUNDER AND ANY WARRANTIES ARISING UNDER SECTIONS 416 AND 417 OF ARTICLE 3 (OR SIMILAR SECTIONS) OF THE UNIFORM COMMERCIAL CODE IN EFFECT IN THE JURISDICTIONS IN WHICH THE PROPERTIES ARE LOCATED OR TO WHICH THE ASSET(S) AND/OR THIS AGREEMENT ARE SUBJECT, AND WITHOUT ANY RECOURSE AGAINST SELLER.

WITHOUT LIMITING THE FOREGOING, BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLER, OR ANYONE ACTING ON SELLER'S BEHALF, MAKES NO REPRESENTATIONS OR WARRANTIES TO BUYER IN CONNECTION WITH, AND ASSUMES NO RESPONSIBILITY FOR: (A) THE SOLVENCY, FINANCIAL CONDITION OR INFORMATION, REPRESENTATIONS, WARRANTIES OR STATEMENTS OF THE MAKERS OF THE NOTE(S); (B) THE EXECUTION, SUFFICIENCY, GENUINENESS, COLLECTABILITY, VALIDITY OR ENFORCEABILITY OF THE NOTE(S) OR OTHER COLLATERAL DOCUMENTS; (C) THE ACCURACY OR COMPLETENESS OF MATTERS DISCLOSED, REPRESENTED OR WARRANTED BY ANY PARTY IN THE NOTE(S), THE LEGAL FILES OR OTHER COLLATERAL DOCUMENTS; (D) THE VALUE OR ANY

ENVIRONMENTAL CONDITION OF THE PROPERTIES OR ANY COLLATERAL SECURING PAYMENT OF THE ASSET(S), OR THE COMPLIANCE OR NON-COMPLIANCE OF THE CURRENT USE, OR ANY FUTURE USE, OF ANY OF THE PROPERTIES WITH APPLICABLE ZONING LAWS OR ANY OTHER GOVERNMENTAL LAWS OR REGULATIONS, INCLUDING BUILDING AND SAFETY CODES; (E) ANY VIOLATION OF APPLICABLE LOCAL, STATE OR FEDERAL ENVIRONMENTAL LAWS AND REGULATIONS (F) THE PRIORITY OF ANY LIEN OR ENCUMBRANCE OF ANY SECURITY INTEREST, IN WHOLE OR IN PART; (G) THE PERFORMANCE OF THE OBLIGATIONS OF ANY PARTY UNDER THE NOTE(S) OR OTHER COLLATERAL DOCUMENTS; OR (H) THE EXISTENCE OR NON-EXISTENCE OF ANY DEFAULT UNDER THE NOTE(S) OR OTHER COLLATERAL DOCUMENTS.  THE ASSET(S) SOLD TO BUYER UNDER THIS AGREEMENT IS SOLD AND TRANSFERRED WITHOUT RECOURSE.

EACH OF THE PARTIES EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY RELATED DOCUMENT, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT OR ANY RELATED DOCUMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE, AND EACH OF THE PARTIES HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT THE SELLER MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THE RIGHT TO TRIAL BY JURY.  THIS PROVISION IS A MATERIAL INDUCEMENT TO THE SELLER TO ENTER INTO THIS TRANSACTION.

[Signatures on Following Page]
[Remainder of Page Intentionally Left Blank]

EXECUTED AS AN INSTRUMENT UNDER SEAL AS OF THE DATE WRITTEN ABOVE.

BUYER*:

CENTRAL PENN CAPITAL
MANAGEMENT, LLC

By: _____

Name: GREGORY K MILLEN

Title: MEMBER

SELLER:

SOVEREIGN BANK

By: _____

Name: Arthur Diez

Title: Head of Collections

Buyer's Address for Notice:

100 S 7th STREET

AKRON PA 17501

Attention: GREGORY K MILLEN

Telephone Number: (717) 859 6300 x 10
Fax Number: (717) 859 3336

* THE BUYER ACKNOWLEDGES AND ACCEPTS THAT THE BID PROCESS
SPECIFICALLY REQUIRED THAT THIS AGREEMENT, THE OTHER SALE
DOCUMENTS AND ALL OTHER DOCUMENTS CONTAINED IN THE BID PACKAGE BE
SIGNED WITHOUT MODIFICATION THERETO, AND THAT ANY SUCH
MODIFICATION, IF MADE BY THE BUYER, ARE OF NO FORCE AND EFFECT. THE
BUYER AGREES THAT THE FAILURE OR REFUSAL OF THE SELLER TO ALTER OR
MODIFY IN ANY WAY THE TERMS OR CONDITIONS OF THIS AGREEMENT SHALL
NOT AFFECT THE OBLIGATION OF THE BUYER TO PERFORM HEREUNDER.

## APPENDIX A

### Definitions

"**Asset(s)**" refers to either the singular or plural, as the context may require, and means the payment obligations and debts evidenced by loan documents and/or data in the possession of the Seller (whether contained in originals, duplicate originals, copies, or magnetic media, including computer tapes and discs) and includes (a) Note(s) and Lost Note Affidavit(s); (b) all rights to payment and other rights, title and interests of the Seller specifically including, all accrued interest and late charges; (c) each Collateral Document; (d) all rights, title, interests, powers, liens or security interests of the Seller in, to or under each Collateral Document, including without limitation claims and rights to and interests in proceeds of hazard or casualty insurance covering collateral securing such Asset and awards in eminent domain and condemnation proceedings affecting such collateral; (e) any right, claim or cause of action, and any liability or counterclaim associated therewith, arising out of or in connection with litigation pending, if any; (f) any judgment or execution based upon loan documents and/or data including without limitation Note(s) or any Collateral Document, to the extent attributable thereto, and any lien arising from any such judgment or execution; and (g) all other documents held by Seller contained in the Asset Documents with respect to the Asset(s), all to the extent the foregoing exist and are in the possession of the Seller. The foregoing definition is not and is not intended to constitute a warranty of the existence of any of the foregoing documents and/or data. Asset(s) shall not include any agreements or contracts related to any interest rate swap agreement, interest rate cap agreement, interest rate floor agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement related to the foregoing executed between any borrower and Seller.

"**Asset Documents**" means all instruments and documents pertaining to the Asset(s) that have been provided by Seller to Buyer as part of Buyer's due diligence in connection with Buyer's purchase of the Asset(s).

"**Bid Award Date**" means the date of the Bid Award Letter.

"**Bid Award Letter**" means the letter from DebtX to the Buyer confirming the Seller's acceptance of Buyer's bid with respect to the Asset(s), in accordance with the terms of the Bid Package.

"**Bid Form**" means the form bid to purchase the Asset(s) submitted by Buyer and accepted by Seller in accordance with the terms of the Bid Package.

"**Bid Package**" means and includes Seller's correspondence to Buyer concerning this transaction, the Bid Form, the Confidentiality Agreement, this Agreement, the Terms of Sale Memorandum and all documents relating hereto.

"**Bid Percentage**" means the percentage amount bid by the Buyer for the Loan(s) as shown on the Bid Form.

15

"**Business Day**" means any day other than a Saturday, Sunday or national holiday.

"**Buyer**" is defined in the preamble hereto, and shall also mean and include its heirs, personal representatives, successors and assigns.

"**Calculation Date**" is defined as the date identified on the Bid Form as the date on which the Asset principal balance was calculated.

"**Closing Date**" is defined as seven days after the date of this Agreement or such other date as Seller and Buyer may agree in writing.

"**Closing Documents**" is defined in Section 4.1 of this Agreement.

"**Collateral Document**" means the Mortgage(s), any assignments of leases and rents, security agreements, financing statements, guaranties, and other agreements or documents, whether an original or a copy and whether or not similar to those enumerated, evidencing, securing, guarantying or otherwise documenting or giving notice of the Asset(s) and any performance or payment obligations with respect thereto, and title insurance policies insuring the liens thereof, if applicable, provided, however, that the term "Collateral Document" shall expressly exclude the Note(s).

"**Confidentiality Agreement**" means any confidentiality agreement executed by Buyer in favor of Seller relating to the sale of the Asset(s).

"**DebtX**" means The Debt Exchange, Inc., or DebtX Securities, Inc., agent for the Seller.

"**Deposit**" means the non-refundable payment under this agreement equal to ten percent (10%) of the Purchase Price which Buyer shall deliver to Seller no later than the close of business on the Business Day following Seller's notice to Buyer of its selection as the winning bidder.

"**Escrow Agent**" means the Seller's counsel, or such other party as the Seller and the Buyer may agree in writing, and shall include its heirs, personal representatives, successors and assigns.

"**Hazardous Substances**" means any material or substance defined or designated as a pollutant, contaminant, hazardous or toxic waste, hazardous, extremely hazardous, toxic or acutely toxic waste, substance, material or constituent or other similar term (including, without limitation, asbestos, petroleum or any fractions thereof, infectious, carcinogenic or other etiologic agents, and urea formaldehyde), by any Federal, state or local environmental statute, regulation, or ordinance presently in effect.

"**Lost Note Affidavit(s)**" means any affidavit executed and delivered by Seller in connection with this Agreement stating, in substance, that with respect to an Asset a Note that was in existence has been lost or misplaced.

"**Mortgage(s)**" means each mortgage, deed of trust or other similar instrument, if any, securing the Note(s), including, without limitation, all modifications, restructurings, extensions consolidations and amendments thereof.

"**Mortgaged Property**" means the real property covered by the Mortgage(s).

"**Note(s)**" means each promissory note or other instrument evidencing indebtedness as listed on Schedule A, including, without limitation, all modifications, restructurings, extensions consolidations and amendments thereof.

"**Obligor**" means the maker, co-maker of the Note(s) and any guarantor, surety or other primary, secondary or other party obligated with respect to the Asset(s) or any performance or payment obligation in connection therewith, and any other party who has granted collateral for or whose property or any part thereof is subject to any encumbrance securing the Asset(s) or any performance or payment obligation in connection therewith.

"**Purchase Price**" means the dollar amount bid by the Buyer for the Asset(s) as shown on the Bid Form.

"**Repurchase Price**" means with respect to the Asset(s), the price to be paid by Seller for such Asset(s) if repurchased from Buyer pursuant to the terms of this Agreement, which shall be computed as follows:

(a) the adjusted Purchase Price for such Asset(s) paid by Buyer; minus

(b) all amounts paid by any Obligor or otherwise received or collected by Buyer in respect of the Asset(s) between the Closing Date and the repurchase date (whether characterized as principal, interest, principal and interest, fees, expenses, proceeds and any other payment of every kind and nature), which amounts shall be evidenced and certified by Buyer to Seller as true and accurate; minus

(c) any diminution in the value of the Asset(s) since the Closing Date attributable to the action, omission or fault of Buyer; plus

(d) all (i) reasonable amounts paid by the Buyer in good faith to third parties to collect principal, interest and other amounts due under the Asset(s), and (ii) commercially reasonable advances made by the Buyer to third parties in order to protect the security of its collateral and other advances made by the Buyer pursuant to the Collateral Documents, in each case from the Closing Date to the repurchase date (as evidenced by invoices and canceled checks).

17

"**Sale Documents**" means the Bid Package, the Confidentiality Agreement, this Agreement and all attachments hereto, and all other instruments, agreements, certificates and other documents at any time executed and delivered by or on behalf of the Seller and/or Buyer in connection with the sale of the Asset(s).

"**Separate Asset Assignments**" is defined in Section 4.4 of this Agreement.

"**Seller**" is defined in the preamble hereto and shall also mean and include its successors and assigns.

"**Terms of Sale Memorandum**" means the Terms of Sale Memorandum posted on the DebtX website (www.debtx.com) or otherwise made available to prospective purchasers in connection with the sale of the Asset(s).

## SCHEDULE A

## SCHEDULE OF ASSETS AND BALANCES

| Offering Number | Borrower Name | Calculation Date Balance as of 11/09/10 | Original Balance | Maturity Date | Current Interest Rate |
|---|---|---|---|---|---|
| debtx_5098 | AIRCRAFT SALES GROUP | $137,288.43 | $160,900.00 | 10/14/2024 | 10/14/2024 |



Redacted